STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT, v.
RAYMOND BERNARD GRICE,
DEFENDANT–APPELLANT.

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT, v.
ALBERT CROWLEY, DEFENDANT–APPELLANT.

Argued September 28, 1987—Decided February 29, 1988.

*Jeffrey B. Steinfeld,* Assistant Deputy Public Defender, argued the cause for appellant Raymond Bernard Grice (*Alfred A. Slocum,* Public Defender, attorney; *Jeffrey B. Steinfeld* and *Felix R. Orraca,* Assistant Deputy Public Defender, on the briefs).

*Kevin G. Byrnes,* Designated Counsel, argued the cause for appellant Albert Crowley (*Alfred A. Slocum,* Public Defender, attorney).

*John J. Scaliti* and *Carol M. Henderson,* Deputy Attorneys General, argued the cause for respondent (*W. Cary Edwards,* Attorney General of New Jersey, attorney).

PER CURIAM.

In this case, the defendants, Raymond Bernard Grice and Albert Crowley, whose appeals were consolidated in the Appellate Division, were convicted after an eight day jury trial of

kidnapping, *N.J.S.A.* 2C:13–1b(1); aggravated sexual assault (two counts), *N.J.S.A.* 2C:14–2; robbery, *N.J.S.A.* 2C:15–1; theft, *N.J.S.A.* 2C:20–3a; aggravated assault (two counts), *N.J. S.A.* 2C:12–1b(5)(a) and 1b(1); receiving stolen property, *N.J. S.A.* 2C:20–7; and attempted sexual assault, *N.J.S.A.* 2C:14–2. The trial court imposed the same sentences on each defendant: a thirty-year term with a fifteen-year parole ineligibility for the aggravated sexual assaults, a consecutive twenty-year term with a ten-year parole ineligibility for the kidnapping, a concurrent twenty-year term for the robbery and an eighteen-month consecutive term for aggravated assault. The theft, receiving stolen property and attempted sexual assault counts were merged into the robbery count, and Violent Crime Compensation Board penalties were assessed against each defendant in the amount of $2,100.

In an unpublished opinion, the Appellate Division affirmed the convictions of the defendants, but remanded the matter for resentencing for reconsideration in light of *State v. Yarbough,* 100 *N.J.* 627 (1985). The trial court has since reimposed the original sentences.

In affirming the convictions, the Appellate Division noted each of several contentions made by the defendants. The issues raised by these contentions related to identification, effective assistance of counsel, fair trial by an impartial jury, admissibility of certain evidence, and sufficiency of evidence, as well as the validity of the sentences. These contentions, as well as an issue raised by the Appellate Division itself concerning trial court comments and the burden of proof, were ultimately rejected as a basis for reversal. We granted defendants' petitions for certification. 107 *N.J.* 92 (1987). We now affirm defendants' convictions substantially for the reasons expressed in the Appellate Division's opinion.

I.

As noted, there are presented on this appeal several legal issues, the resolution of which turns ultimately upon disputed

facts. An understanding of the record is thus essential in determining the appeal. The facts surrounding the commission of the crimes were adequately summarized by the Appellate Division, *viz:*

On February 11, 1981, after an evening of bowling, the victim arrived at her home in Belleville at approximately 9:15 p.m. As she turned to leave her garage she felt an arm over her neck and mouth. She turned and saw two "dark faces." She tried to struggle, but she had a weak right arm due to paralysis as a child. She had an opportunity to see the perpetrators as they stood beneath her garage light. She further viewed them when they forced her into the back of her car, when the car passed under a street light and, after parking in a remote area of Branch Brook Park, when they repeatedly raped her, forced her to perform oral sex, attempted to sodomize her, beat her unmercifully and threatened to kill her. The attackers then pushed her from the car, and shortly afterwards she was picked up by a motorist who took her to his apartment from which she called her tenant, a policeman, as well as the Newark and Belleville Police Departments. She was immediately taken to a local hospital in a hysterical condition. She was there found to have a torn retina and two facial fractures. The police took her to the Rape Unit at United Hospitals where treatment was continued. She was administered numerous medications, 25 by her count.

In the interim, off-duty Newark police officer Avalone, who had been working part-time at the United Hospitals' emergency room, was informed of the rape and given a description of the car. When he finished his shift he began searching for the vehicle. At approximately 11:30 p.m. he saw the car on Mt. Prospect Avenue in Belleville, and followed it through the Belleville streets. When it stopped for a red light, he pulled his vehicle alongside and then tried to block the path of the car. He left his car and drew his service revolver ordering the two black males seated in the front seat to "freeze." The car then swerved and tried to hit Avalone, whereupon Avalone fired and saw the passenger fall to the floor of the car. The car then sped away. Avalone testified that he had thought he had "blown his head off."

Approximately 50 minutes later two other police officers saw the vehicle parked in Newark where [defendant] Crowley stated he had left it. The officers staked out the vehicle and, as noted earlier, apprehended defendants after they entered the vehicle.

## II.

■ We concur in the Appellate Division's rejection of the contentions based upon improper or inadequate identifications. The Appellate Division noted that identifications were made by police officer Avalone, as well as the victim herself, immediately after defendants' arrest, which occurred within hours of the

commission of the crimes. The testimony relating to the identification of the defendants as recapitulated by the Appellate Division was:

> Avalone was called to the scene of the arrest and immediately identified defendants as the men who had attempted to run him down. Defendants were then taken to headquarters and the victim, although not "enthused" about going to police headquarters and hysterical upon arriving there (she initially refused to look at the suspects), agreed to view them. In the individual show-up procedures (there was no formal line-up), defendants were required to repeat some of the phrases the victim had said were employed by the perpetrators when they had threatened, beat and raped her. After this procedure, the victim identified both defendants.

The Appellate Division correctly reviewed this testimony and the circumstances surrounding the identification under the plain error test of *Rule* 2:10–2. It carefully applied the standards of *Neil v. Biggers,* 409 *U.S.* 188, 93 *S.Ct.* 375, 34 *L.Ed.*2d 401 (1972), and concluded, soundly in our view, that the identifications were admissible, *viz:*

> The victim's description to the police of her assailants was limited to their having dark faces and one being tall and the other short (defendants are within one inch of each other's height), and that they were both wearing leather jackets, one brown and the other beige. She stated, however, that she remembered them and could positively identify them if they were shown to her. She neglected to state that Crowley had a mustache and mutton-chop sideburns as well as a scarred face, and that Grice had a black mark in the center of his forehead and extremely large lips. We note, however, that although the victim, while in the initial shock of the encounter, may not have been able to articulate why she could identify her assailants,[1] the presence of these distinctive features might have aided in her immediate recognition of defendants. Her in-court identification was also definite and unequivocal.

 The Appellate Division further ruled that the identification testimony was not impugned by ineffective assistance of counsel under *Strickland v. Washington,* 466 *U.S.* 668, 104 *S.Ct.* 2052, 80 *L.Ed.*2d 674 (1984), to which can be added *State*

---

[1]The lack of detail in the post-assault description is also explained by the fact that the victim was never asked to give a detailed description of her assailants. The brief description discussed above was obtained by the victim's tenant, a police officer, who testified that he did not attempt to elicit a more detailed description since at that time the victim was hysterical and awaiting medical treatment. Defendants were arrested less than three hours later.

*v. Fritz,* 105 *N.J.* 42 (1987). Nor did the court below believe there was ineffective assistance of counsel attributable to an alleged conflict of interest as a result of an office-sharing arrangement between defense counsel. Finding support in the analogous case of *State v. Bell,* 90 *N.J.* 163 (1982), the court concluded that in this case, given the mutuality of defenses, there was no possibility of conflict.

## III.

■ The Appellate Division declined to consider the contention of defendant Grice that the alibi testimony demonstrated the guilty verdict was against the weight of the evidence. It refused to rule on this contention because defendant had failed to move on this ground for a new trial as required under *Rule* 2:10–1. Further, the court was not persuaded that its review would be productive because of the "intangibles" embedded in the record and the unlikelihood of being able to find "clearly and convincingly" that "there was a manifest denial of justice under the law" under *Rule* 3:20–1, so as to mandate a reversal.

We do not disagree with the Appellate Division's reasons for refusing to review the sufficiency of the evidence of guilt in light of defense alibi testimony. Nevertheless, such a review is unavoidable, in our opinion, because of the relevance of this testimony to other claimed errors and the question of whether these other errors had a prejudicial impact sufficient to warrant reversal of the guilty verdicts.

■ Although the alibi testimony of defendants was quantitatively impressive, it was not intrinsically impregnable. A review of the transcript reveals that the impartiality of Grice's alibi witnesses is highly suspect. Several of Grice's alibi witnesses testified that they were close friends of Grice, and the alibi witnesses were all friends of each other. Furthermore, two of Grice's alibi witnesses were also friends of Crowley. In addition, Grice's alibi witnesses, although all testifying that they were with him at the time of the crime, did not agree on

where they were when they were with him. This discrepancy was a source of difficulty for Grice's attorney during his summation, and was also commented on during the prosecution's summation. Further, the testimony of some of Grice's alibi witnesses is inconsistent with respect to the presence of another one of the alibi witnesses. Finally, one of Grice's and two of Crowley's alibi witnesses testified that they remembered hearing of the arrest the next day at school. It was pointed out, however, that the Newark public schools were closed the two days following the arrest, as well as the weekend that followed and the Monday thereafter.

It is against this testimony, as well as that relating to the identifications, that we address whether certain alleged trial errors require a reversal. One of these errors involved the failure of the trial court to examine or excuse a juror who was observed crying during the victim's testimony. We concur in the ruling of the Appellate Division that any failure on the part of the trial court to deal further with this juror does not singly or in conjunction with other errors warrant a reversal.

Similarly, we do not find reversible error in the admission into evidence of a brown leather jacket taken from defendant Crowley's apartment. As the court below pointed out, it should have been excluded under *Evidence Rule* 4 because it was not shown to belong to the defendant but was only similar to the jacket described by the victim as having been worn by one of her attackers during the commission of the crimes. It does not appear, however, that its prejudicial impact would account for the jury's ultimate guilty verdict.

Another trial error considered by the Appellate Division was not raised by defendants and, indeed, was not vigorously argued before this Court. Nevertheless, it is troublesome and its resolution has entailed a close review.

During the summation of defense counsel, the following occurred:

COUNSEL: Let's look at the scientific evidence—

PROSECUTOR: Objection. Your Honor, there was evidence available to defense counsel and I have an objection to defense counsel bringing something in he didn't bring in—

THE COURT: There was no scientific evidence in this case and either party had the opportunity if they so desired to have scientific evidence and neither party chose to do so and, therefore, [counsel], do not comment upon scientific evidence.

COUNSEL: That's what I was going to say. There is no scientific evidence.

Ladies and gentlemen, there is no scientific evidence that was presented to you by the prosecution.

PROSECUTOR: Objection.

THE COURT: There was no scientific evidence presented by either the prosecution or defense counsel and the statement of defense counsel is not a proper comment. There is no scientific evidence involved in this case. If either party wanted to bring scientific evidence into this case, they should have done so and neither party did, to my recollection.

Proceed.

As observed by the Appellate Division, this exchange could have given the jury the impression there was some duty on the part of defendants to have brought forward exculpatory scientific evidence.[2] However, immediately following the judge's informing the jury that both sides could have brought scientific evidence forward, Mr. DePalma, counsel for defendant Crowley, proceeded with his summation by telling the jury that

as the Judge has told you and as Miss Cooper has indicated, there has been no scientific evidence of either the defense or the prosecution but, the prosecution brought in Detective Dillon to tell you that what was on those floor mats was blood. How does Detective Dillon know that's blood? Because it's red, he says it's blood? Ladies and gentlemen, *that's what we mean by proving beyond a reasonable doubt,* that what it means is the State had to prove their case to you beyond a reasonable doubt. *Defense doesn't have to prove anything to you.*

These defendants stand before you innocent until you determine whether or not they committed the crime which is alleged by the prosecution. *So the*

---

[2]The Appellate Division requested and reviewed the scientific evidence that had been furnished to defendants in discovery, and concluded that it was "essentially equivocal." Although there were blood and seminal stains on the victim's clothing, analysis of these stains was inconclusive since the victim and defendant Grice have the same blood type and defendant Crowley is a non-secretor whose blood type cannot be determined from semen traces. Furthermore, tests failed to uncover any traces of foreign body hair on the victim, despite the fact that it is uncontested that she was raped.

*Judge may instruct you that we have the right to bring scientific evidence forward* and Miss Cooper may indicate that we have the right to bring scientific evidence forward but, *what did the State bring forward to you?* The only thing that the State brought forward was [the victim], Detective Dillon and then anything else was a smoke screen. (Emphasis added.)

Comments by the trial judge during summation also underscored the State's failure to produce incriminating scientific evidence.[3] During the prosecutor's summation, Mr. Egenberg, counsel for defendant Grice, objected when the prosecution made references to stains on Grice's coat because of the lack of any scientific evidence pertaining to these stains. As a result of this the following was stated in open court:

THE COURT: Members of the jury, there was a statement made by Mrs. Cooper with reference to stains on that coat. That coat is in evidence and you will have an opportunity to take it with you to the jury room. However, I do not recollect any testimony with reference to the stains being on there at the time the coat was taken and therefore, based upon that, I'm going to ask you to disregard in your determination whether or not there was blood on it at that particular time.

Proceed, Miss Cooper.

MR. EGENBERG: Judge, excuse me. We don't have any testimony as to whether there is even blood stains. The Court just said it's blood. We don't know what that is. *There is no scientific testimony whatsoever as to what is on that coat.*

THE COURT: *What Mr. Egenberg says is true.* There is no scientific evidence of what that stain consists of. (Emphasis added).

This was reiterated by the court in its actual charge to the jury: "There has been no testimony with reference to stains, if any, were on the coats at the time they were taken."

Both defense counsel's summation and the court's charge to the jury also clearly delineated the proper burdens of proof. Defense counsel stressed that:

[t]he defense has no obligation to put on a defense. There is no obligation whatsoever. In fact, even with an alibi, it's the State's burden and not ours.

---

[3]Defense counsel have argued that they were prevented from arguing to the jury that an adverse inference could be drawn from the failure of the State to produce scientific evidence. In fact, defense counsel reiterated to the jury the failure of the State to produce such evidence, *supra* at 386–387, and further discussed in detail the lack of scientific evidence concerning the composition of the stains on a jacket admitted into evidence. *Infra* at 388.

> It's the State's burden, again, to prove to you that it was still these people. The Judge will tell you that. It's their burden, not ours. I didn't have to ask one question throughout this whole case. I don't have to stand up now. I don't have to do anything and you can still acquit him if you want.

In its jury instructions the court explicitly reinforced all these points:

> Now, the defendants as are all defendants in criminal cases are presumed to be innocent until proven guilty beyond a reasonable doubt.
>
> Now, that presumption continues throughout the entire proceeding and even during your deliberations in the jury room unless and until you have determined that the State has proven the guilt of the defendants beyond a reasonable doubt.
>
> The burden of proof is on the State and it never shifts. It remains on the State throughout the whole trial of the case. No burden with respect to proof is imposed on the defendants. They are not obliged to prove their innocence, and unless the State has proved the crimes charged in its elements beyond a reasonable doubt, the defendants are entitled to an acquittal.
>
> \* \* \* \* \* \* \* \*
>
> Now, the defendants as part of their general denial of guilt contends that the State has not presented sufficient reliable evidence to establish beyond a reasonable doubt that they are the persons who committed the alleged offenses or the identity of the person or persons who committed the crime is an issue. The burden of proving that identity is upon the State.

The trial court's clear statement in its instructions stressing defendants' contention that sufficient reliable evidence had not been presented by the State, combined with the earlier specific direction to the jury that there was no scientific evidence concerning blood stains, neutralizes the effect of any prejudicial influence that might otherwise have arisen from the court's earlier statement. This is especially true in light of the statements by Mr. DePalma in his continued summation, which clearly emphasized the State's failure to bring forward scientific evidence.

We concur in the Appellate Division's conclusion that there was no substantial prejudicial impact attributable to the errors that occurred in the course of summation. We are unable to conclude that the single remark by the trial court during summation, which was effectively overcome by later summa-

tions and specific instructions, contributed to the guilty verdicts.

## IV.

In conclusion, we are satisfied substantially for the reasons expressed by the Appellate Division, as further explicated in this opinion, that the errors complained of and otherwise noted did not generate such a sufficient prejudicial impact as to mandate a reversal of the guilty verdicts. Accordingly, the judgments of convictions are affirmed.

O'HERN, J., dissenting.

In this case I am unable to concur that the trial error found by the Appellate Division and this Court was not capable of producing an unjust result. There is no litmus test that will answer such questions. In some cases the evidence of guilt is so overwhelming that none can debate the fairness of sustaining a conviction despite error. *See United States v. McDaniel,* 538 *F.*2d 408 (D.C.Cir.1976) (receipt of inadmissible evidence was harmless since other evidence of guilt was overwhelming).

Both defendants in this case presented alibi defenses. While their alibis were not airtight in every detail and contained internal inconsistencies, certain facts appear to be unassailable. Grice was in the Ironbound Boys Club at 7:30 p.m.; the disinterested supervisor in charge of the Ironbound Boys Club produced the score book for that night showing that Grice had played in a basketball game that began at 6:30 p.m. The score book also showed that there had been forfeiture of a second game, thereby corroborating the testimony that Grice had played in a pickup game and had not left the Boys Club until 8:45 p.m. on that night. The Ironbound Boys Club is located in the "Down Neck" section of Newark; the crime occurred in Belleville, north of Newark, at about 9:10 p.m.; the distance between the two sites is approximately five miles. The FDR Homes, where some of Grice's teammates said they gathered with him after

the game, are but a short distance from the Boys Club. One such witness testified that he recalled the second game because he had been guarding Grice when Grice shot the winning basket.

Crowley's defense rested on both his own testimony and that of other witnesses. His alibi was that at the time of the crime he had been watching television at a friend's apartment in the Christopher Columbus Homes. Four witnesses corroborated his account, including his friend's mother. Crowley admitted having subsequently taken the crime car, which he claimed to have found abandoned at the intersection of Duryee and Orange Streets in Newark—a point midway between the Christopher Columbus Homes and his home at the Georgia King Village, and a point that he would have passed on his way home. The assisting officer, Avalone, testified that there had been a recent series of incidents in the North Newark area involving rapes "where the cars were dumped off."

In challenging the State's case, the defendants had to counter strong and forceful eyewitness identifications by the victim and by a police officer who had assisted her. Here, too, there were inconsistencies. At the time of the incident, neither the victim nor the officer was able to furnish detailed descriptions of the attackers. When first brought to the hospital, the victim could describe her assailants only as two black men with no "unusual" features; "one was tall and one was short." However, Grice and Crowley are nearly identical in height. Admittedly, the brutalized victim of rape should not be expected to furnish an itemized recount of her assault, but the pursuing police officer, who was at one time within feet of the suspects, also gave no pre-arrest descriptions. The victim also testified that her assailants twice said, "[w]e don't have to take the train now." Yet, the defendants both lived relatively close to the crime scene. Although the victim's menstrual blood was found on the back seat of the car, no blood, hairs, or fibers from the victim were found on any of the clothing or person of either defendant. (Concededly they could have had time to wash or

dispose of the garments, but when arrested Crowley was wearing a track suit, which he said he had worn at track practice that day.)

Since the violence of the crime was admitted, the case involved not a question of what degree of crime was committed, but the most fundamental of all questions: were the defendants there? Did they commit the criminal acts? Of course I agree that such factual contests must be won or lost in the courtroom, but the defendants must be free to present to the jury all logical inferences that may be drawn from the evidence.

As strange as it may seem, eyewitness testimony is not as unassailable as we might wish. Both history and science have demonstrated this. "The vagaries of eyewitness identification are well-known; the annals of criminal law are rife with instances of mistaken identification." *United States v. Wade*, 388 *U.S.* 218, 228, 87 S.Ct. 1926, 1933, 18 *L.Ed.*2d 1149, 1158 (1967) (footnote omitted); *see* Barkowitz & Brigham, *Recognition of Faces: Own–Race Bias, Incentive, and Time Delay*, 12 *J. Applied Soc. Psychology* 255, 261 (1982); Buckhout, *Eyewitness Testimony, SCI. AM.*, Dec. 1974, at 23; (Note that the victim did use her recollection of the assailants' voices to bolster her identification.)

Still, one shred of scientific evidence would have provided the strongest link to demonstrate the defendants' guilt: one telltale fiber, one human hair. *See State v. Reldan*, 100 *N.J.* 187, 194 (1985). "[A] criminal always leaves behind substances or impressions at the crime scene, and he always carries something away, no matter how minute that evidence might be." Rapps, *Scientific Evidence in Rape Prosecution*, 48 *UMKC Law Rev.* 216, 227 (1980) (footnote omitted). Blood, hairs, and fibers are often "transferred from the victim to the assailant." Tucker, *The Use of Scientific Evidence in Rape Prosecutions*, 18 *U.Rich.L.Rev.* 851, 860, 863, 867 (1984). In this case, the police had taken defendants' underwear "for analysis." Defense counsel should have been free to argue that there was no

telltale scientific link between the defendants and the crime. Counsel for defendant Crowley was at a critical stage in seeking to influence the sensitive process of jury deliberations in this case. He had reached the point in his summation when he asked the jury to consider the relative credibility of the witnesses and then "once that determination is made, you have to determine whether or not there are any doubts." When he started to say, "Let's look at the scientific evidence—," the prosecutor objected. The court concluded that since both parties had the opportunity to produce scientific evidence, defense counsel could not comment on its absence.

After discussing the inconclusive nature of the scientific evidence ["there was no evidence either definitely linking defendants to or excluding them from participation in the crime"], the Appellate Division ruled:

> Nonetheless, defendant should have been free to argue that no scientific evidence connected them with the crime. Since they were apprehended soon after the crime and were thoroughly examined for Caucasian hairs, blood and semen stains, the lack of such evidence on their persons and on the jacket introduced in evidence was at least relevant. The failure of the State to come forward with any scientific proof raised a fair inference that such proof was either unavailable or not probative of guilt. The jury was free to assume that if defendants were guilty, some forensic proof would tie them to the crime. Thus, counsel should have been free to urge such inference in summation. Also improper was the implication from the court's statements that defense counsel had some duty to present scientific evidence and that if any party wished to have such evidence introduced he "should have done so." These statements by the court were in error, but not so grievous to have affected the results, since during the extended trial the identification issue was squarely placed before the jury.

Of course, the identification issue was for the jury, but counsel should have been free to address the jury as entitled by law.

This Court recognizes the same errors, but it too believes that the errors were incapable of producing an unjust result. The prosecutor knew the significance of this issue. In her closing, she made reference to the fact that "the State didn't produce scientific evidence. Why?" She answered her own question this way: "Because they got up and said to you there is no question there was a rape." That was not the effect that

comment about scientific evidence might have had on the jury, for everyone knew that there had been a rape. The defendants should have been free to argue that the absence of any scientific evidence connecting *them* to the rape cast doubt on the reliability of the identifications and gave credence to their alibi defenses.

The significance of the trial court's ruling was highlighted in a later exchange between the State and the defense. When defense counsel objected to the State's being permitted to infer that stains on the perpetrators' coats were blood, counsel for defendant Grice protested:

Your Honor, we were barred from making any comments on scientific evidence.
THE COURT: It's true.
COUNSEL: ——The Court knows if I wanted to I could load up the 12 gauge shotgun and fire it anyway and have the Judge yell at me, impose sanctions or whatever it wants.

Indeed, the Appellate Division and this Court hold that the the jacket itself was erroneously admitted into evidence, since it was Crowley's father's jacket and there was no reliable proof that Crowley had ever worn it, much less that it had blood on it.

Of course, none of this establishes that defendants are innocent. I realize that the human horror of this case makes us recoil from the order of a retrial. Still, "[t]he accused, no matter how abhorrent the offense charged nor how seemingly evident the guilt, is entitled to a fair trial * * *." *State v. Orecchio*, 16 *N.J.* 125, 129 (1954). I simply cannot determine with certainty how the jury would have resolved this case had counsel been free to argue the issues as they wished. As we explained in *State v. Ramseur*, 106 *N.J.* 123 (1987),

errors which impact substantially and directly on fundamental procedural safeguards, and particularly upon the sensitive process of jury deliberations, are not amenable to harmless error rehabilitation. Their prejudicial effect "cannot be readily measured by the empirical or objective assessment of the evidence bearing upon defendant's guilt." A defendant confronted with this kind of trial error need not demonstrate actual prejudice in order to reacquire his right to a fair trial.

[*State v. Ramseur, supra*, 106 *N.J.* at 312 (quoting *State v. Czachor*, 82 *N.J.* 392, 404 (1980) (citations omitted)).]

This Court has always placed an extraordinarily high premium on the jury's correct understanding that defendants have no burden to clear themselves of guilt. *See State v. Spano*, 64 *N.J.* 566 (1974). Thus, I cannot conclude with certainty that the error that the Court recognizes could not have affected the outcome of the trial or have led "the jury to a result it otherwise might not have reached." *State v. Macon*, 57 *N.J.* 325, 336 (1971).

*For affirmance* —Justices HANDLER, POLLOCK, GARIBALDI and STEIN—4.

*For reversal and remandment* —Chief Justice WILENTZ, and Justices CLIFFORD and O'HERN—3.