946 A.2d 550

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT,
v. MYLEE COTTLE, DEFENDANT–APPELLANT.

Argued October 22, 2007—Decided May 6, 2008.

450

---

*Paul J. Casteleiro* argued the cause for appellant.

*Lucille M. Rosano,* Assistant Prosecutor, argued the cause for respondent (*Paula T. Dow,* Essex County Prosecutor, attorney).

*Jeffrey S. Mandel* argued the cause for amicus curiae Association of Criminal Defense Lawyers of New Jersey (*Day Pitney,* attorneys).

*Leslie-Ann M. Justus,* Deputy Attorney General, argued the cause for amicus curiae Attorney General of New Jersey (*Anne Milgram,* Attorney General, attorney).

*Mylee Cottle* submitted a letter brief, pro se.

Justice ALBIN delivered the opinion of the Court.

In this case, an attorney representing a juvenile charged with murder in Essex County kept secret from his client that he—the attorney—had been indicted for criminal stalking in the same county. Indeed, the attorney did not disclose to his client that both simultaneously were criminal defendants being prosecuted by the Essex County Prosecutor's Office. With the consent of the Prosecutor's Office, but unknown to his client, the attorney later gained admission into the Essex County Pretrial Intervention (PTI) Program. Despite his pending indictment and his obligation to report to the Prosecutor's Office as a condition of his enrollment in the PTI program, the attorney continued to represent the juvenile, even through a jury trial. Tried as an adult, the juvenile was convicted of murder.

In this appeal, we must determine whether the attorney's representation of the juvenile constituted an intolerable conflict of interest, rendering that representation constitutionally ineffective and requiring the grant of a new trial. Presented here is the unseemly appearance of an attorney entangled in a conflict that pitted his personal welfare against his professional obligations to his client. We now hold that an attorney has a per se conflict of interest when both he and his client are simultaneously under indictment in the same county and being prosecuted by the same prosecutor's office. Without an informed waiver made in court and on the record, prejudice will be presumed, rendering the representation ineffective. The undisclosed conflict in this case denied the juvenile the effective representation of counsel guaranteed to him under Article I, Paragraph 10 of the New Jersey Constitution and therefore he is entitled to a new trial.

## I.

### A.

In May 1995, defendant Mylee Cottle, then seventeen years old, was charged in an Essex County juvenile complaint with murder and related weapons offenses. In June 1995, for a fee of $10,000, defendant's family retained Steven Olitsky, Esq., to defend him against those charges. Olitsky did not advise defendant or his family that just three months earlier an Essex County grand jury had returned a six-count indictment against him for third-degree stalking, *N.J.S.A.* 2C:12–10(c); fourth-degree stalking, *N.J.S.A.* 2C:12–10(b); and four counts of fourth-degree contempt for violating a restraining order issued to protect his former girlfriend, *N.J.S.A.* 2C:29–9(b).

In February 1996, after a waiver hearing in the Chancery Division, Family Part, at which Olitsky represented defendant, the court determined that defendant would be tried as an adult in the Law Division, Criminal Part. One month later, an Essex County grand jury returned an indictment charging defendant with purposeful or knowing murder, *N.J.S.A.* 2C:11–3(a)(1) or –3(a)(2); third-degree unlawful possession of a weapon, *N.J.S.A.* 2C:39–5(b); and second-degree possession of a weapon for an unlawful purpose, *N.J.S.A.* 2C:39–4(a).

In April 1996, with the consent of the Essex County Prosecutor's Office, a Superior Court judge admitted Olitsky into PTI for a period of three years. *See N.J.S.A.* 2C:43–12 and –13; *R.* 3:28. PTI is a statewide program that allows eligible defendants charged with first-time, non-violent offenses to avoid prosecution by receiving supervisory or rehabilitative treatment for a period not to exceed three years. *N.J.S.A.* 2C:43–12(a) and –13(c). If a defendant successfully completes the program, the criminal charges are dismissed. *See N.J.S.A.* 2C:43–13(d); *R.* 3:28(c). The terms of Olitsky's admission into the PTI program required him to comply with the restraining order entered against him, to pay restitution to his victim, to have no contact with the victim or her

family, and to continue psychiatric treatment "until discharge or referral for other treatment."

Olitsky also was required to report to the Essex County Prosecutor's Office "immediately if there [was] any change in the course of [his] treatment" and to have his mental health provider submit to the Prosecutor's Office "quarterly reports describing [his] treatment status." Most significant to this appeal, Olitsky was obliged to "have each client sign an acknowledgment of his participation in the PTI program" and then to "submit a copy of [the acknowledgment] to the PTI program and to the Prosecutor's Office." Neither the PTI program nor the Prosecutor's Office ever received a signed acknowledgment that Olitsky advised defendant or the Cottle family about his PTI status. At no time did Olitsky inform defendant or the Cottle family about his indictment in Essex County and his participation in PTI.

On December 9, 1996, the Disciplinary Review Board (DRB), which reviews charges of professional misconduct filed against attorneys, issued a decision recommending that this Court suspend Olitsky from the practice of law for three months for commingling personal and client funds in 1994 in violation of *Rules of Professional Conduct* (*RPC*) 1.15(a) and 8.4(c).[1] That same day—the first day of defendant's murder trial—Olitsky kept from his client the looming ethical problems that would result in this Court suspending Olitsky for three months, effective May 16, 1997. *In re Olitsky*, 149 *N.J.* 27, 28–29, 692 *A.*2d 43 (1997).[2]

---

[1] The DRB decision also noted that Olitsky began visiting a psychologist sometime in 1994, and a psychiatrist three times a week by mid-1995 related to his stalking indictment and other personal and professional problems.

[2] In our order, we required that "prior to reinstatement to practice [Olitsky] shall demonstrate by competent psychiatric proof that he is fit to practice law." *Olitsky, supra,* 149 *N.J.* at 29, 692 *A.*2d 43. We then granted his motion to stay the effective date of the suspension until June 1, 1997. *In re Olitsky*, 149 *N.J.* 226, 693 *A.*2d 457 (1997). Olitsky remained suspended until his eventual disbarment in October 2002 for, among other things, continuing to practice law while suspended. *In re Olitsky*, 174 *N.J.* 352, 806 *A.*2d 798 (2002).

## B.

At defendant's three-day trial, the jury heard testimony describing a chance street encounter and argument that had deadly consequences. The State presented the following case. On April 19, 1995, at approximately 9:30 p.m., Darren Williams was driving with his friend, Rosalie Hooper, westbound on South Orange Avenue in Newark when their car was forced to stop due to a double-parked car blocking their path at the intersection of Halsted Street. At the time, defendant was standing by the double-parked car, speaking with the driver. Williams honked the horn for the car to move, and defendant responded with some words directed at Williams. Then, Williams exited from his car, walked up to defendant, and began arguing with him. Soon afterwards, an agitated Williams got back in his car and drove in reverse down Halsted Street, where he parked. Not heeding his companion's suggestion to drive away, Williams left the car again and, with a cell phone in hand, headed toward South Orange Avenue. Meanwhile, Hooper remained standing by the car.

Ten minutes later, Williams returned to his car and got behind the wheel as Hooper took the passenger's seat. Just as they were about to pull away, defendant approached the driver's side of the car and exchanged some words with Williams. Defendant then shot Williams twice. Williams stepped from the car and ran a short distance before collapsing. He died a short while afterwards.

The next day, at a Newark police station, Hooper identified defendant from a photographic array as the person who argued with and shot Williams. She also identified defendant in court.

Patricia Hazelwood, a hair stylist at a beauty salon located on Halsted Street near the intersection of South Orange Avenue, observed the unfolding tragedy through the store window. She saw Williams and defendant arguing on South Orange Avenue and later defendant chasing Williams back to his car. Fearing that "something was going to happen," Hazelwood ducked down and then heard someone say, "oh, My God, he shot him." Hazelwood

made both an out-of-court photographic identification and in-court identification of defendant, whom she had seen in the neighborhood on several occasions.

A key State's witness, Ronnie Walker described himself as "an associate," although not a friend, of defendant, whom he knew from the area. Walker observed the initial argument between defendant and Williams. After Williams backed up onto Halsted Street, exited his car, and walked towards South Orange Avenue, defendant told Walker that he thought Williams "might be strapping something," apparently suggesting that Williams could be armed with a gun or some other weapon.

Defendant then entered and exited a nearby building and began to chase Williams. Walker did not see either defendant or Williams holding a weapon. After Williams entered his car, defendant and Williams were "tussling" as defendant tried to open the car door. Walker saw defendant waving something in the air and then heard "about five" gunshots. Defendant fled the scene. Later that evening, Walker came upon defendant and defendant's brother Hassan. Defendant made no response to Walker when told that Williams had died.

Defendant's brother, Hassan, testified for the defense and explained that on April 19, 1995, he worked the 4:00 p.m. to 12:30 a.m. shift at the Short Hills Hilton and saw neither his brother nor Walker that evening. Defendant did not testify.

## C.

The jury found defendant guilty of all three counts in the indictment. The trial court sentenced defendant to a term of life imprisonment with thirty years of parole ineligibility on the murder conviction and to a concurrent five-year term with a two-year parole disqualifier on the unlawful possession of a weapon conviction. The possession of a weapon for an unlawful purpose conviction was merged into the murder conviction.

The Appellate Division affirmed defendant's conviction in an unpublished, per curiam opinion. This Court denied defendant's petition for certification. 160 *N.J.* 477, 734 *A.*2d 792 (1999).

## II.

### A.

In December 2001, defendant filed a petition for post-conviction relief (PCR) based on claims of ineffective assistance of counsel, and a motion for a new trial based on newly-discovered evidence. With regard to the ineffective-assistance-of-counsel claim, defendant alleged that Olitsky (1) failed to disclose to him that he was under criminal indictment and facing professional discipline at the time of the murder trial; (2) was "distracted and intimidated from [providing] an effective defense" because the Essex County Prosecutor's Office was investigating his own misconduct; (3) did not "effectively consult" with defendant before trial; (4) failed to contact alibi witnesses who would have provided information that defendant was not at the crime scene at the time of the murder; (5) neglected to obtain the employment records of defendant's brother Hassan, which would have impeached Walker's claim to having seen Hassan with defendant on the evening of the murder; (6) permitted defendant to appear in prison garb in full view of two jurors; and (7) erroneously advised defendant not to testify under the mistaken belief that defendant's juvenile record could be used for impeachment purposes.[3]

In support of those claims, defendant presented certified statements from a number of potential witnesses. In his own certification, defendant averred that on the evening of the homicide he had gone to a Multiplex Theater in Newark with his friend, Michelle Jackson, and that he had given Jackson's name and the names of two other alibi witnesses to Olitsky. According to defendant,

---

[3] At the PCR hearing, defendant's counsel also referred to Olitsky's meager opening statement, which takes up little more than a transcript page.

Olitsky failed to contact any of those persons. Defendant stated that he did not take the stand in his own defense because Olitsky "advised me that if I did testify that my juvenile record would be brought out against me to impeach my credibility."

In her certification, Jackson asserted that on April 19, 1995, between approximately 6:30 p.m. and 10:00 p.m., she and defendant had gone to see a movie. Olitsky, according to Jackson, never spoke with her. Hassan Cottle certified that his employment records—had Olitsky obtained them—would have verified that he was at work at the time Walker claimed to have seen him with defendant.

In his certification, defendant also stated that he had minimal contact with Olitsky before his juvenile waiver hearing and murder trial, that as the trial began Olitsky told him that "the Prosecutor's Office was distracting him by placing pressure on him on a personal matter," and that Olitsky did not arrange for him to have proper attire when he entered the courtroom, allowing two jurors to see him in "orange prison pants."

In addition, defendant offered as newly-discovered evidence a recantation by Walker certifying that he "gave a statement under duress to the police which falsely implicated the defendant in the shooting." According to Walker, on the evening of the homicide, he was both high on drugs and "completely intoxicated," and "did not see who fired the shots and to this day do[es] not know the identity of the shooter." He alleges that he implicated defendant "only because I was afraid I would otherwise be charged with the homicide."

Defendant, moreover, presented Olitsky's extensive ethics history, detailing the attorney's personal and financial travails and psychiatric treatment during the time period he represented defendant. After defendant's trial, Olitsky was not only disbarred for professional misconduct (unrelated to defendant's trial), but also failed to successfully complete the PTI program. As part of a global plea deal with the Essex County Prosecutor's Office, Olitsky was readmitted into PTI in exchange for his pleading guilty to

fourth-degree stalking, and also pled guilty to three counts of the unauthorized practice of law.

In April 2005, the PCR judge—the same judge who had presided at defendant's trial—denied the PCR application and defendant's motion for a new trial, without conducting an evidentiary proceeding. Although the PCR judge found that Olitsky "fail[ed] to disclose" to defendant and his family his pending indictment and ethics charges, he concluded that the omission of that information did not render Olitsky's representation constitutionally ineffective. The PCR judge determined that some of the alleged deficiencies imputed to Olitsky by defendant could be explained as trial strategy within the realm of acceptable professional judgment. Thus, the failure to call alibi witnesses or defendant to the stand was justifiable because the State would have impeached defendant with statements inconsistent with his alibi defense that he had made to his expert psychologist and a State's psychiatrist in preparation for his juvenile waiver hearing. The PCR judge agreed that Olitsky improperly advised defendant that his juvenile record could be used for impeachment purposes against him, but indicated that defendant should have raised the issue when the court addressed him generally on his right to testify. The PCR judge also surmised that it would have been ineffective representation for counsel to have put defendant on the stand because defendant "had the coldest eyes I've ever seen."

Last, the PCR judge did not find Walker's recantation credible, particularly in light of the persuasive testimony of the other two eyewitnesses to the events surrounding the shooting. In short, the judge concluded that the testimony of those witnesses provided overwhelming evidence of defendant's guilt.

B.

In an unpublished, per curiam opinion, the Appellate Division affirmed the denial of defendant's petition for post-conviction relief and motion for a new trial, substantially for the reasons given by

the PCR judge. The panel determined that the claimed deficiencies ascribed to Olitsky in preparing for and conducting defendant's trial did not constitute ineffective assistance of counsel under *Strickland v. Washington,* 466 *U.S.* 668, 687, 104 *S.Ct.* 2052, 2064, 80 *L.Ed.*2d 674, 693 (1984), and *State v. Fritz,* 105 *N.J.* 42, 58, 519 *A.*2d 336 (1987). The panel found that Olitsky's representation of defendant did not fall below an objective standard of reasonableness, as defined in *Strickland* and *Fritz,* and that his decisions, such as not calling alibi witnesses who would have testified in conflict with defendant's earlier statements to mental health experts, must be presumed to have been strategic calculations. Other errors, such as the failure to subpoena defendant's brother Hassan's work records to impeach Walker's testimony, the panel maintained, "could not possibly have had any impact on the jury verdict." The panel likewise concluded that the newly-discovered evidence—Walker's recantation of his trial testimony—would "probably" not have altered the outcome of the verdict because two other witnesses identified defendant, providing "overwhelming" evidence of defendant's guilt.

Although the panel accepted as "undisputed" that Olitsky did not tell defendant of his admission into PTI or of his impending disciplinary suspension, it rejected defendant's assertion that Olitsky's stalking indictment and pending ethics charges constituted a per se conflict of interest. The panel distinguished defendant's case from *State v. Norman,* 151 *N.J.* 5, 697 *A.*2d 511 (1997), and *State v. Bellucci,* 81 *N.J.* 531, 410 *A.*2d 666 (1980), in which this Court held that, absent a valid waiver, "simultaneous dual representations of codefendants" by "a private attorney, or any lawyer associated with that attorney," will give rise to "a per se conflict" and presumed prejudice. *Norman, supra,* 151 *N.J.* at 24–25, 697 *A.*2d 511; *accord Bellucci, supra,* 81 *N.J.* at 543, 410 *A.*2d 666. The panel believed, as did the PCR judge, that Olitsky "was not under indictment while representing defendant" during the trial because he was in PTI, and on that basis concluded that "there

was no potential or actual conflict of interest." [4]

Additionally, concerning the ethics complaints lodged against Olitsky, the Appellate Division held that there was ample evidence to support the PCR judge's findings that Olitsky's "personal, legal and professional problems did not amount to a constructive denial of counsel or per se prejudice to defendant" or that there was "any significant likelihood of prejudice" resulting from a potential or actual conflict of interest. Last, the panel determined that the PCR judge did not abuse his discretion in ruling that it was unnecessary to conduct an evidentiary hearing because of defendant's failure to "present[ ] a prima facie case for PCR."

We granted defendant's petition for certification, 190 *N.J.* 256, 919 *A.*2d 850 (2007), and the motions of the Attorney General and the Association of Criminal Defense Lawyers of New Jersey (ACDL) to participate as amici curiae.

### III.

Defendant raises before this Court primarily the same issues argued before the Appellate Division and the PCR judge. We address here only whether Olitsky's representation of defendant, while both attorney and client were simultaneously under indictment in Essex County and subject to prosecution by the Essex County Prosecutor's Office, constituted a per se conflict of interest and therefore ineffective assistance of counsel.

Defendant asks this Court to recognize a per se conflict of interest when an attorney under indictment is representing a defendant prosecuted by the same office prosecuting the attorney, absent a valid waiver by the client. He submits that a "per se rule" is needed because a pending criminal indictment against the

---

[4] The Appellate Division and PCR judge were both mistaken on that point. An indictment is still pending during the period a defendant is enrolled in a PTI program. *See N.J.S.A.* 2C:43–13(b); *R.* 3:28(b)-(c). An indictment is dismissed only after successful completion of the program, and then by order of the court, "with the consent of the prosecutor." *N.J.S.A.* 2C:43–13(d); *R.* 3:28(c)(1).

attorney in the same county in which the client is charged places restraints "on the attorney's advocacy and independent judgment, and the harmful effects of the conflict will not ordinarily be identifiable on the record." For that reason, defendant urges this Court to extend the rationale of our ruling in *Bellucci, supra,* in which we held that a per se conflict of interest exists when a private attorney or an associate of that attorney is involved in the simultaneous dual representation of codefendants. *See* 81 *N.J.* at 543, 410 *A.*2d 666. Such an approach, he asserts, "will insure the integrity of the process" and the "constitutional right to counsel." Alternatively, even if this Court were not to adopt a per se rule, defendant contends that the actual or potential conflict of interest arising from Olitsky's indictment and admission into PTI created a "great likelihood of prejudice," mandating reversal of his conviction.

The ACDL, as amicus curiae, submits that the conflict in this case provides as good a reason for applying a per se conflict rule as the dual representation cases. The ACDL believes that public confidence in our criminal justice system will be "seriously eroded" if a per se conflict is not recognized here because counsel's "freedom and professional career were at the mercy of the Essex County Prosecutor's Office" at the same time counsel was responsible for zealously representing his client against that office.

The State, on the other hand, argues that the *Bellucci* per se conflict rule should not be extended beyond the limited facts of that case. Rather, the State contends that this Court should follow the fact-sensitive conflict-of-interest standard enunciated in *State v. Bell,* 90 *N.J.* 163, 447 *A.*2d 525 (1982), to ensure that a well-founded criminal conviction is not reversed when a defendant is otherwise competently represented by counsel. Here, the State reasons that Olitsky's enrollment in the PTI program eight months before defendant's trial removed the "potential choice between his own self-interest and his duty to his client," suggesting that once in the program Olitsky was no longer in jeopardy of prosecution. Even if it were to concede a conflict, the State

submits that defendant failed to show that Olitsky's self-interest adversely affected the representation he provided or the probable outcome of the case, a necessary prerequisite under the *Strickland/Fritz* standard. From that vantage point, the State does not discern any deprivation of defendant's constitutional right to effective assistance of counsel.

The arguments of the New Jersey Attorney General, as amicus curiae, mirror those presented by the State. The Attorney General emphasizes that Olitsky's legal problems were his own, completely unrelated to his representation of defendant, and on that basis submits that no conflict of interest existed to support a claim of ineffective assistance of counsel.

We first address whether Olitsky's representation of defendant while both attorney and client were simultaneously under indictment in the same county and being prosecuted by the same prosecutor's office constituted a conflict of interest and, if so, whether Olitsky's admission into the PTI program before defendant's trial eliminated the conflict.

## IV.

### A.

The paramount obligation of every attorney is the duty of loyalty to his client. *State ex rel. S.G.*, 175 *N.J.* 132, 138, 814 *A.*2d 612 (2003) (citing *In re Opinion No. 653 of the Advisory Comm. on Prof'l Ethics*, 132 *N.J.* 124, 129, 623 *A.*2d 241 (1993)). A client charged with a crime places his fate in the hands of his attorney, who stands between him and the considerable power of the State—a power mostly exercised through the office of the county prosecutor. The stakes are high in a criminal case with the client's freedom often hanging in the balance. With so much on the line, an attorney's self-interest should never interfere with the duty of unstinting devotion to the client's cause. An attorney should never place himself in the position of serving a master other than his client or an interest in conflict with his client's

interest. *See id.* at 139, 814 *A.*2d 612. Surely, the attorney must never be perceived as having a reason to curry some personal favor with the prosecutor's office at the expense of his client.

Those simple yet fundamental assumptions underlie our Rules of Professional Conduct. *RPC* 1.7(a)(2) specifically prohibits a lawyer from representing a client if "there is a significant risk that the representation of one or more clients will be materially limited . . . by a personal interest of the lawyer." The sole exception to that rule is when the "client gives informed consent, confirmed in writing, after full disclosure and consultation," and even then the lawyer may represent a client only if he "reasonably believes that [he] will be able to provide competent and diligent representation to [the] client" and "the representation is not prohibited by law." *RPC* 1.7(b). It is through the prism of our case law and Rules of Professional Conduct, which require unswerving fidelity to the client's interests, that we now view the factual setting before us.

### B.

When the Cottle family retained Olitsky for a fee of $10,000 to represent the seventeen-year-old defendant charged with murder, Olitsky made no mention that he was under indictment for criminal stalking and being prosecuted by the Essex County Prosecutor's Office—the same office criminally prosecuting defendant. While under indictment, Olitsky represented defendant at a juvenile waiver hearing, a critical proceeding for any juvenile,[5] and his adversary in that matter was the same adversary in his own case—the Essex County Prosecutor's Office. In such circumstances, it is not difficult to imagine that Olitsky might not have had the zeal to engage in a bruising battle with the very prosecu-

---

[5] "The transfer or waiver hearing is a very critical stage in a homicide proceeding against a juvenile, perhaps the most critical stage in many cases. Once the waiver of jurisdiction occurs, the juvenile 'loses all the protective and rehabilitative possibilities available to the Family Part.' " *State v. Ferguson,* 255 *N.J.Super.* 530, 535, 605 *A.*2d 765 (App.Div.1992) (quoting *State v. R.G.D.,* 108 *N.J.* 1, 5, 527 *A.*2d 834 (1987)).

tor's office that would be weighing his fate. Given his own criminal jeopardy and its threat to his professional career, Olitsky surely had no personal incentive—even if it were in his client's best interest—to take on the office that he would need to help him. Like many first-time charged criminal defendants, Olitsky pursued enrollment in PTI, but the way would be smooth only with the cooperation and consent of the Prosecutor's Office.

Indeed, Olitsky gained admission into PTI with the consent of the Essex County Prosecutor's Office before defendant's trial. Both the PCR judge and the Appellate Division mistakenly believed that enrollment in a PTI program resulted in dismissal of the indictment. On Olitsky's admission into PTI, the proceedings against him were suspended, but the indictment stood until he successfully fulfilled all of the conditions of his enrollment. *See* *N.J.S.A.* 2C:43–12(e), –13(b), and –13(d); *R.* 3:28(b)-(c). Those conditions included performing 150 hours of community service, making restitution to the victim of his stalking, keeping the Prosecutor's Office abreast of his psychiatric treatment status by providing quarterly reports to it, advising that office if he changed his mental healthcare provider, having "each client sign an acknowledgment of his participation in the PTI program," and submitting "a copy of [the acknowledgment] to the PTI program and to the Prosecutor's Office." Not only did those terms require Olitsky to report to the office prosecuting his client, but that same prosecutor's office had the power to institute proceedings to terminate him from the PTI program if, in its view, Olitsky violated the terms of his PTI enrollment. *See* *N.J.S.A.* 2C:43–13(e); *R.* 3:28(c)(3).[6]

---

[6] As evidence of the breadth of the prosecutor's discretion and power, we need only look at Olitsky's PTI experience. After defendant's trial, Olitsky was discharged from PTI for violating the terms of his agreement and the case against him was reinstated. As part of a global plea agreement with Olitsky, the Prosecutor's Office permitted him to be readmitted into PTI on the criminal stalking charge.

Olitsky was under indictment and subject to prosecution during the entire period of his representation of defendant. It was Olitsky's dependence on the Prosecutor's Office, which was pursuing a murder conviction against his client, that undermined his own professional independence. *See People v. Edebohls*, 944 *P.*2d 552, 556 (Colo.Ct.App.1996) (holding that counsel who was being prosecuted by same district attorney's office prosecuting his client "may well have been 'subject to the encumbrance that the prosecutor might take umbrage at a vigorous defense' of defendant and become more ardent in the prosecution of defense counsel" (quoting *People v. Castro*, 657 *P.*2d 932, 945 (Colo.1983))). This was a scenario fraught with the real potential of impairing an attorney's zealous advocacy on behalf of a client.

Accordingly, we conclude that there was a "significant risk" that Olitsky's representation of defendant was "materially limited" by his "personal interest" in charges pending against him and by his dependency on the Essex County Prosecutor's Office during the period he was enrolled in the PTI program. *See RPC* 1.7(a)(2). A defense attorney at the mercy of the very prosecutor's office trying his client for murder has a conflict of interest.

Next, we must determine whether the conflict deprived defendant of his right to effective assistance of counsel.

## V.

### A.

Both the United States Constitution and New Jersey Constitution guarantee every person accused of a crime the right to the assistance of counsel. *U.S. Const.* amend. VI ("In all criminal prosecutions, the accused shall ... have the Assistance of Counsel for his defence."); *accord N.J. Const.* art. I, ¶ 10. Inherent in the right to the assistance of counsel is the right to effective counsel. *Norman, supra,* 151 *N.J.* at 23, 697 *A.*2d 511 (citing *Glasser v. United States,* 315 *U.S.* 60, 70, 62 *S.Ct.* 457, 465, 86 *L.Ed.* 680, 699 (1942)). Under our State Constitution, "[e]ffective

counsel" is an attorney who represents his client with undivided loyalty, " 'unimpaired' by conflicting interests." *Ibid.* (quoting *Bellucci, supra,* 81 *N.J.* at 538, 410 *A.*2d 666). That being the case, it becomes clear that an attorney hobbled by conflicting interests that so thoroughly impede his ability to exercise single-minded loyalty on behalf of the client cannot render the effective assistance guaranteed by our constitution.

We have adhered to a two-tiered approach in analyzing whether a conflict of interest has deprived a defendant of his state constitutional right to the effective assistance of counsel. *Norman, supra,* 151 *N.J.* at 24–25, 697 *A.*2d 511. In those cases in which we have found a per se conflict, prejudice is presumed in the absence of a valid waiver, and the reversal of a conviction is mandated. *See ibid.; Bellucci, supra,* 81 *N.J.* at 543, 410 *A.*2d 666. Thus far, we have limited the per se conflict on constitutional grounds [7] to cases in which "a private attorney, or any lawyer associated with that attorney, is involved in simultaneous dual representations of codefendants." *Norman, supra,* 151 *N.J.* at 24–25, 697 *A.*2d 511.[8] In all other cases, "the potential or actual conflict of interest must be evaluated and, if significant, a great likelihood of prejudice must

---

[7] In *State v. Clark,* 162 *N.J.* 201, 744 *A.*2d 109 (2000), *overruled on other grounds by State v. Rue,* 175 *N.J.* 1, 811 *A.*2d 425 (2002), we exercised our supervisory authority over the practice of law in this state to amend *Rule* 1:15–3(b) to bar a municipal prosecutor from representing a defendant in any municipal court or Superior Court in the same county in which the attorney serves as a municipal prosecutor. *Id.* at 206–07, 744 *A.*2d 109.

[8] We have rejected extending the per se conflict approach to cases in which staff attorneys in the same public defender's office represent codefendants in the same criminal action, *Bell, supra,* 90 *N.J.* at 167, 447 *A.*2d 525, and in which two private attorneys representing codefendants discussed forming a partnership, but did not establish the partnership until after the trial, *Norman, supra,* 151 *N.J.* at 29–30, 697 *A.*2d 511. We also did not find a per se conflict when two attorneys representing codefendants shared office space, but were not otherwise associated with one another. *See State v. Grice,* 109 *N.J.* 379, 385, 537 *A.*2d 683 (1988). Those cases, we determined, simply did not present the overriding concern of divided loyalties triggering the need for a presumption of prejudice.

be shown in that particular case to establish constitutionally defective representation of counsel." *Id.* at 25, 697 *A.*2d 511.

In *State v. Land,* 73 *N.J.* 24, 372 *A.*2d 297 (1977), a dual representation case, we recognized that when an "attorney cannot or may not be able to pursue an unrestrained course of action in favor of a defendant because he represents a codefendant, his effectiveness as counsel has been hampered." *Id.* at 30–31, 372 *A.*2d 297. We thereafter adopted a per se conflict rule because " '[t]he harm in [such cases] is caused by the restraints placed on an attorney's advocacy and independent judgment ... [and because] [t]he harmful effects of a conflict ... will not ordinarily be identifiable on the record.' " *Norman, supra,* 151 *N.J.* at 24, 697 *A.*2d 511 (quoting *Bellucci, supra,* 81 *N.J.* at 543, 410 *A.*2d 666); *see also United States v. Cronic,* 466 *U.S.* 648, 661 n. 28, 104 *S.Ct.* 2039, 2048 n. 28, 80 *L.Ed.*2d 657, 669 n. 28 (1984) (" 'Joint representation of conflicting interests is suspect because of what it tends to prevent the attorney from doing.' " (quoting *Holloway v. Arkansas,* 435 *U.S.* 475, 489–90, 98 *S.Ct.* 1173, 1181, 55 *L.Ed.*2d 426, 438 (1978))). We understood that without a per se conflict rule, "[r]equiring a showing of prejudice would place an impossible burden on the accused and force the reviewing courts to engage in 'unguided speculation.' " *Bellucci, supra,* 81 *N.J.* at 543, 410 *A.*2d 666 (quoting *Holloway, supra,* 435 *U.S.* at 491, 98 *S.Ct.* at 1182, 55 *L.Ed.*2d at 438). We also feared that without such a rule in dual representation cases, public confidence in the criminal justice system would be diminished. *See Bellucci, supra,* 81 *N.J.* at 541, 410 *A.*2d 666. Thus, in finding a per se conflict in *Bellucci,* we held that absent a valid waiver, multiple representation of defendants by the same lawyer or lawyers in the same private law firm is not only barred, but constitutes ineffective assistance of counsel. *Id.* at 545–46, 410 *A.*2d 666.

■ We believe that the logic of the per se rule in dual representation cases is equally applicable to the facts of this case. Although the conflict-of-interest issue before us is one of first

impression,[9] other courts have addressed the issue. For example, in *Edebohls, supra,* the Colorado Court of Appeals reversed a defendant's conviction because the same district attorney's office was responsible for simultaneously prosecuting both defense counsel and his client. 944 *P.*2d at 554. In that case, the defendant retained counsel to represent him at a criminal racketeering trial. *Ibid.* At the same time, defense counsel was being prosecuted on an unrelated charge by the same district attorney's office. *Ibid.* The Court of Appeals reversed the defendant's conviction, finding that the conflict constituted ineffective assistance of counsel because there was not a valid waiver. *Id.* at 558–59; *see also People v. Waddell,* 24 *P.*3d 3, 8–11 (Colo.Ct.App.2000) (finding that although defense counsel had conflict of interest because both he and his client were simultaneously under prosecution by same district attorney, defendant validly waived conflict on record and in court); *cf. People v. Graham,* 206 *Ill.*2d 465, 276 *Ill.Dec.* 878, 795 *N.E.*2d 231, 236 (2003) (recognizing per se conflict when defense counsel has "actual or potential conflict of interest stemming from a previous or current commitment to a party with interests adverse to the defendant ... and the defendant does not waive the conflict").

One scholar has commented that when counsel "is the subject of an ongoing investigation or has some other special relationship with the prosecution that might lead counsel to place that relationship above the best interests of his client[,] [m]uch can be said for adopting in such cases ... a standard of per se ineffectiveness." 3 LaFave, *Criminal Procedure* § 11.9(d), at 939–40 (3d ed. 2007); *see also id.* § 11.9(d), at 918 & nn. 174–75 (noting that some state

[9] This case is unlike *State v. Pych,* 213 *N.J.Super.* 446, 517 *A.*2d 871 (App.Div. 1986), *certif. denied,* 107 *N.J.* 90, 526 *A.*2d 167 (1987), in which counsel was under indictment in a different county from the one where his client was charged. *Id.* at 454, 517 *A.*2d 871. In declining to find a per se conflict and violation of the defendant's constitutional right to effective assistance of counsel, the Appellate Division emphasized that counsel and his client were not only indicted in different counties, but also being prosecuted by different offices. *Id.* at 454, 457, 517 *A.*2d 871.

courts have recognized per se conflicts). Without such a standard, "the issue becomes whether counsel could have done more than he or she did, which seems always to be the case." *Id.* § 11.9(d), at 940.

Our Court's rulings have exhibited a much lower tolerance for conflict-ridden representation under the New Jersey Constitution than federal courts have under the United States Constitution. "To give full meaning to our State constitutional guarantee of the effective assistance of counsel," we have determined that certain attorney conflicts render the representation per se ineffective. *Bellucci, supra,* 81 *N.J.* at 545–46, 410 *A.*2d 666; *see also Norman, supra,* 151 *N.J.* at 24–25, 697 *A.*2d 511. In doing so, we have parted ways with the federal courts, which have generally eschewed finding per se conflicts under the Sixth Amendment. *See ibid.* In *Mickens v. Taylor,* 535 *U.S.* 162, 122 *S.Ct.* 1237, 152 *L.Ed.*2d 291 (2002), the United States Supreme Court held that a presumption of prejudice arises only when the conflict is an " 'an actual conflict of interest,' " meaning "a conflict *that affected counsel's performance*—as opposed to a mere theoretical division of loyalties." [10] *Id.* at 171 & n. 5, 122 *S.Ct.* at 1243 & n. 5, 152 *L.Ed.*2d at 304 & n. 5. Nevertheless, even under that standard, federal courts have reversed convictions when defense counsel was either under investigation or being prosecuted by the same United States Attorney's office prosecuting his client.[11]

---

[10] That language limited the reach of *United States v. Cronic, supra,* which held that a presumption of ineffective assistance is appropriate in cases when the "circumstances ... are so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified." 466 *U.S.* 648, 658, 104 *S.Ct.* 2039, 2046, 80 *L.Ed.*2d 657, 667 (1984).

[11] *See, e.g., United States v. Levy,* 25 *F.*3d 146, 156 (2d Cir.1994) (reversing defendant's conviction due to conflict because attorney "may have believed he had an interest in tempering his defense of [his client] in order to curry favor with the prosecution" in light of pending charges against him during pretrial stage of client's case); *United States v. McLain,* 823 *F.*2d 1457, 1463–64 (11th Cir.1987) (reversing defendant's conviction, in part because same office prosecuting defendant at time of criminal trial was investigating his defense counsel,

## B.

The same concerns about divided loyalties present in *Bellucci*, which gave rise to a per se conflict in certain dual representation cases, are present here. Once he was indicted and even after his admission into PTI, Olitsky, to some degree, might have been counting on the kindness of the Essex County Prosecutor's Office. In light of his predicament, there was the clear "possibility that [he] might be subject to subtle influences which could be viewed as adversely affecting his ability to defend his client in an independent and vigorous manner." *People v. Washington*, 101 *Ill.*2d 104, 77 *Ill.Dec.* 770, 461 *N.E.*2d 393, 396–98 (quotation omitted) (finding per se conflict because counsel, who served as part-time municipal prosecutor, cross-examined police officer from that same municipality when representing his client in criminal case), *cert. denied.*, 469 *U.S.* 1022, 105 *S.Ct.* 442, 83 *L.Ed.*2d 367 (1984). Here, as in the dual representation cases, the prejudice flowing from "the restraints placed on an attorney's advocacy and independent judgment" is difficult, if not impossible, to measure. *Bellucci, supra*, 81 *N.J.* at 543, 410 *A.*2d 666. That is so because the harm inflicted by such a conflict "will not ordinarily be identifiable on the record." *Ibid.*

Without a presumption of prejudice, this Court is left to speculate whether Olitsky's own criminal jeopardy was somehow related to his perfunctory opening statement, to his few meetings and communications with his client, to his failure to robustly challenge the identifications or present an alibi defense, and to a number of other alleged pre-trial and trial lapses. Although a convicted defendant is not entitled to a new trial merely because his otherwise competent attorney could have tried a better case, no convicted defendant should wonder whether his fate was sealed

who subsequently was indicted); *Rugiero v. United States*, 330 *F.Supp.*2d 900, 906–07 (E.D.Mich.2004) (finding actual conflict because counsel was under investigation by same prosecutor's office bringing criminal case against his client and because attorney had "obvious self-serving bias in protecting his own liberty interests and financial interests").

because his attorney's duty of zealous advocacy was compromised by fear for his own wellbeing.

Interestingly, the court and the prosecutor, if only constructively, knew about Olitsky's indictment and PTI status. So did Olitsky. Defendant was the only one left in the dark. Moreover, the Prosecutor's Office should have known that Olitsky was not in compliance with the conditions of his enrollment in PTI because it had not received a signed acknowledgment by defendant that Olitsky had informed defendant of his participation in the PTI program.

Last, without any credible evidence in the record that Olitsky advised defendant or his family of his pending indictment or his PTI status, we cannot possibly conclude that defendant waived the conflict. We will not find waiver from a silent record or presume waiver of the constitutional right to effective counsel. *Norman, supra,* 151 *N.J.* at 35, 697 *A.*2d 511. For a valid waiver in a case such as this, the defendant must be informed in court and on the record of the attorney's criminal predicament that may be adverse to the best interests of the client.[12] Then, after full disclosure, the defendant must knowingly, intelligently, and voluntarily agree to proceed with a conflict-tainted attorney. In addition, the attorney must aver that despite the conflict he "reasonably believes that [he] will be able to provide competent and diligent representation" to the client. *See RPC* 1.7(b)(2).[13]

---

[12] The trial court should encourage the defendant to consult with an independent attorney. The court may appoint an attorney to assist the defendant in determining whether to waive the conflict should it conclude that such an approach would be in the interests of justice.

[13] Because the PCR judge denied defendant's request for an evidentiary hearing, no further light was shed on the statement in defendant's certification that at the beginning of the trial "Olitsky informed me ... that the Prosecutor's Office was distracting him by placing pressure on him on a personal matter." Nevertheless, the PCR judge found and the Appellate Division deemed it "undisputed" that Olitsky did not advise his client about his admission into PTI or his disciplinary problems. The State and defendant in their briefs accept as fact

## VI.

In summary, an attorney who is contemporaneously under indictment in the same county as his client, and being prosecuted by the same prosecutor's office, is engaged in a per se conflict of interest, absent a valid waiver by the client. In such a circumstance, the representation is rendered ineffective under our State Constitution. The calculus does not change if the attorney is in a PTI program in the same county where his client is charged with an indictable offense. Because Olitsky's representation of defendant constituted a per se conflict, and because defendant did not waive the conflict, prejudice is presumed. We therefore are compelled to conclude that defendant has been denied the effective representation of counsel guaranteed by Article I, Paragraph 10 of the New Jersey Constitution. Accordingly, we need not address the other issues raised in defendant's PCR application and new trial motion.

For the reasons given, we reverse the judgment of the Appellate Division and defendant's convictions, and remand for a new trial consistent with this opinion.

*For reversal and remandment*—Chief Justice RABNER and Justices LONG, LaVECCHIA, ALBIN, WALLACE, RIVERA–SOTO and HOENS—7.

*Opposed*—None.

---

Olitsky's failure to disclose that information. In the end, the PCR judge's failure to conduct an evidentiary hearing concerning defendant's knowledge does not alter the outcome because a reversal of defendant's conviction is mandated in the absence of a knowing, voluntary, and intelligent waiver of the conflict in open court.