NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2638-22

STATE OF NEW JERSEY

    Plaintiff-Respondent,

v.

DANA KEARNEY,

    Defendant-Appellant.

APPROVED FOR PUBLICATION
September 18, 2024
APPELLATIE DVISION

Submitted September 12, 2024 – Decided September 18, 2024

Before Judges Sabatino, Berdote Byrne, and Jacobs.

On appeal from the Superior Court of New Jersey, Law Division, Middlesex County, Indictment No. 16-10-1645.

Jennifer Nicole Sellitti, Public Defender, attorney for appellant (Steven M. Gilson, Designated Counsel, on the brief).

Yolanda Ciccone, Middlesex County Prosecutor, attorney for respondent (Erin M. Campbell, Assistant Prosecutor, on the brief).

The opinion of the court was delivered by

SABATINO, P.J.A.D.

Defendant Dana Kearney, who was convicted of murder and other offenses at his 2017 jury trial, appeals the trial court's denial of his petition for

postconviction relief ("PCR") without an evidentiary hearing. He alleges his trial counsel was constitutionally ineffective in two respects.

In this opinion we afford substantial discussion as to one of those claims: whether defendant's representation was compromised because his co-parent and girlfriend, who was called at trial as a fact witness for the State, paid for the legal fees of his private criminal defense attorney. Defendant alleges the fee arrangement created an untenable conflict of interest.

For the reasons that follow, we affirm the PCR court's determination that defendant was not deprived of effective representation of his counsel, who represented him zealously at trial. In particular, defense counsel vigorously cross examined the witness, who had paid his fees, about certain incriminating statements she made regarding defendant to police detectives.

We agree with the PCR court that the fee arrangement, of which defendant was surely aware, did not create a per se conflict of interest that disqualified his counsel in the circumstances presented. Nor has defendant shown he was actually prejudiced or subject to a great likelihood of such prejudice.

I.

The background facts and procedural history are detailed in our 2020 unpublished opinion affirming the convictions of defendant and his two

codefendants, Shane Timmons and Joseph Kearney. State v. Timmons, et al., A-2567-17, A-2843-27, A-4138-17 (App. Div. Jan. 7, 2020). We incorporate those details here by reference.

Briefly stated, the indictment stemmed from the fatal stabbing of the victim, Christopher Sharp, on August 18, 2013, at a house in Perth Amboy where defendant's girlfriend and co-parent, Alicia Boone, resided with defendant and her three children. Sharp was Boone's cousin. A party took place at the house that night, at which defendant was present. An argument between defendant and Sharp ensued. According to the State's proofs, defendant stabbed Sharp three times sometime in the early morning.

The jury found defendant guilty of murder and other serious offenses and also found his two codefendants guilty of charged offenses. The trial court sentenced defendant to an aggregate fifty-year sentence with a forty-year period of parole ineligibility under the No Early Release Act, N.J.S.A. 2C:43-7.2.

Our lengthy unpublished opinion of January 7, 2020 affirmed the convictions and sentences of all three defendants. Timmons, slip op. at 1. The Supreme Court denied this defendant's petition for certification. State v. Dana Kearney, 244 N.J. 349 (2020).

In his PCR petition, defendant made two claims now before us alleging his trial counsel—who is now deceased—was ineffective. First, he mainly argues his attorney had a conflict of interest because his defense fees were paid by Boone, who was called as a witness for the State at trial. Second, he claims his lawyer failed to give him proper advice about his right to testify under the Fifth Amendment. The PCR judge rejected both claims. On the conflict issue, she found no per se ethical violation in the fee arrangement. On the Fifth Amendment issue, she was satisfied the trial transcript clearly showed defendant agreed on the record that counsel had advised him of his right to testify.

In his brief on appeal, defendant advances the following arguments:

I.      TRIAL COUNSEL'S INHERENT CONFLICT OF INTEREST, THAT THE STATE'S MAIN WITNESS HIRED AND PAID FOR DEFENDANT'S TRIAL COUNSEL, CONSTITUTES PER SE INEFFECTIVENESS AND MANDATES THAT DEFENDANT'S CONVICTIONS BE REVERSED; IN THE ALTERNATIVE, THIS MATTER MUST BE REMANDED FOR AN EVIDENTIARY HEARING BECAUSE DEFENDANT ESTABLISHED A PRIMA FACIE CASE OF TRIAL COUNSEL'S INEFFECTIVENESS.

II.     TRIAL COUNSEL'S ABRIDGING DEFENDANT'S CONSTITUIONAL RIGHT TO TESTIFY CONSTITUTES INEFFECTIVENESS OF COUNSEL AND MANDATES THAT DEFENDANT'S CONVICTIONS BE REVERSED; IN THE ALTERNATIVE, THIS MATTER MUST BE

4                                                          A-2638-22

REMANDED FOR AN EVIDENTIARY HEARING BECAUSE DEFENDANT ESTABLISHED A PRIMA FACIE CASE OF TRIAL COUNSEL'S INEFFECTIVENESS.

We reject these arguments, having applied the relevant legal principles to the record.

II.

Our analysis applies well established standards that govern a criminal defendant's claims of ineffective assistance of counsel. Under the Sixth Amendment of the United States Constitution, a person accused of crimes is guaranteed the effective assistance of legal counsel in that person's defense. Strickland v. Washington, 466 U.S. 668, 687 (1984); State v. Cottle, 194 N.J. 449, 466 (2008). To establish a deprivation of that right, a convicted defendant must satisfy the two-part test prescribed in Strickland by demonstrating that: (1) counsel's performance was deficient, and (2) the deficient performance actually prejudiced the accused's defense. Strickland, 466 U.S. at 687; see also State v. Fritz, 105 N.J. 42, 58 (1987) (adopting the Strickland two-part test in New Jersey).

With respect to the first prong of deficient performance, "the test is whether counsel's conduct fell below an objective standard of reasonableness." State v. Savage, 120 N.J. 594, 614 (1990) (citing Strickland, 466 U.S. at 688). "[A] defendant challenging assistance of counsel must demonstrate that

5

counsel's actions were beyond the 'wide range of professionally competent assistance.'" Ibid. (quoting Strickland, 466 U.S. at 690).

Courts apply a strong presumption that defense counsel "rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." Strickland, 466 U.S. at 690. Given that presumption, "complaints 'merely of matters of trial strategy' will not serve to ground a constitutional claim of inadequacy." Fritz, 105 N.J. at 54 (quoting State v. Williams, 39 N.J. 471, 489 (1963)); see also State v. Echols, 199 N.J. 344, 357-59 (2009). "The quality of counsel's performance cannot be fairly assessed by focusing on a handful of issues while ignoring the totality of counsel's performance in the context of the State's evidence of defendant's guilt." State v. Castagna, 187 N.J. 293, 314 (2006) (citing State v. Marshall, 123 N.J. 1, 165 (1991)). "To rebut that presumption, a defendant must establish that trial counsel's actions did not equate to 'sound trial strategy.'" State v. Chew, 179 N.J. 186, 203 (2004) (quoting Strickland, 466 U.S. at 689). "In evaluating a defendant's claim, the court 'must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of the attorney's conduct.'" Ibid. (quoting Strickland, 466 U.S. at 690).

"[T]o satisfy the second prong—that a defendant has been prejudiced by

counsel's actions—there must be a 'reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" Savage, 120 N.J. at 614 (quoting Strickland, 466 U.S. at 694). "[T]he ultimate focus of inquiry must be on the fundamental fairness of the proceeding whose result is being challenged." Strickland, 466 U.S. at 696.

Here, as is often the case, defendant's claims of counsel's ineffectiveness have been asserted through a PCR petition. A defendant must establish by a preponderance of the credible evidence entitlement to the relief requested in the petition. State v. Nash, 212 N.J. 518, 541 (2013). To sustain that burden, the defendant must allege and articulate specific facts that "provide the court with an adequate basis on which to rest its decision." State v. Mitchell, 126 N.J. 565, 579 (1992). "[B]ald assertions" of deficient performance are simply insufficient to support a PCR application. State v. Cummings, 321 N.J. Super. 154, 170 (App. Div. 1999); see also R. 3:22-10(b); State v. Porter, 216 N.J. 343, 355 (2013) (reaffirming these principles in evaluating which of a defendant's various PCR claims warranted an evidentiary hearing).

With these general principles in mind, we turn to defendant's specific claims.

A-2638-22

A.

Defendant's conflict of interest argument warrants our more extensive discussion. His specific claim that his trial counsel was per se compromised because a prosecution witness paid his defense counsel's fees has not previously been the subject of a published opinion in our State. The following circumstances in the record inform our analysis.

1.

As we noted above, this criminal case arose from the stabbing death of Sharp at the home of Boone. The stabbing occurred in the early morning hours of August 18, 2013, following a gathering that began at the home the day before. Boone lived in Perth Amboy with her three children, and the youngest child's father, defendant. Timmons, slip op. at 6. Boone, the witness who is at issue on appeal, was defendant's then-girlfriend and co-parent of her youngest child, and Sharp's cousin. Boone did not observe the stabbing, as she had left for her mother's house with her children beforehand. Boone had given defendant a ride to her mother's house and then had a conversation with defendant about him needing to go back to her house to check on Sharp. Boone learned later of Sharp's death.

 A-2638-22

Boone's Three Interviews and Statements to Police

Following the homicide, Police Detective Marcos Valera and Police Sergeant Jose Rodriguez interviewed Boone three times at the Perth Amboy police station. Timmons, slip op. at 17. Boone's first statement to police occurred on the morning of August 18, 2013, a few hours after Sharp's death.

At trial, Boone acknowledged she told the police in her first interview that, shortly after the incident, defendant had told her he needed to return to her house because "Chris got cut," referring to the victim.

Boone's second statement to the police took place later that afternoon. In her second statement, Boone expressed concerns for her family "because [defendant] was 'mean.'" Timmons, slip op. at 18. "She said her first statement to the officers was '90 percent true.'" Ibid. Boone acknowledged "initially telling detectives that [defendant] said he thought [Sharp] was 'cut,' but told them in her second statement that [defendant] said he 'poked' Sharp or 'another word like that.'" Ibid.

On August 21, Boone voluntarily returned to the police station and gave a third statement. Ibid. She recounted in that third statement that defendant admitted to her, "'I poked Chris.'" Ibid.

Boone's Trial Testimony

The State called Boone as a witness at trial, essentially to confirm the

substance of her statements to the police.  The State specifically elicited Boone's recounting during her second and third interviews that defendant told her he had "poked" Sharp.

During Boone's cross-examination, defendant's counsel[1] zeroed in on the seven hours between Boone's first and second statements to the police. Defendant's counsel elicited testimony from Boone that she had been scared after an off-the-record conversation with another Police Detective, Carlos Rodriguez, which occurred in between her first and second statements, in which that detective allegedly "insinuated [Boone] wasn't going home." Boone agreed with counsel's query that she changed her statement regarding defendant because of that intimidation, and that "in a sense the[] [police] kind of broke [her]."

On redirect, Boone was vague in her recollection of the timing of her interaction with Detective Carlos Rodriguez and how and why her demeanor changed for the second statement.  In this regard, Boone testified that

> [e]veryone had left.  So, I asked Detective [Carlos] Rodriguez, I said,—I said, everybody's leaving.  And he said, yeah.  And I said, am I being locked up?  No. I said, is there—I said, everyone's—I said, am I being

---

[1] Counsel for the two other codefendants also questioned Boone, but less extensively, after this defendant's counsel's cross-examination.  They did not avail themselves of re-cross.  Throughout this opinion, the counsel at issue in this appeal will be identified as "defendant's counsel" or "his counsel."

locked up for something? And he said, well why do you ask that? And I said, because you let everyone leave but me. And he said, now that's a good observation. I insinuated that meant I was not going home, because all he had to say was yes or no. And that's not what he said.

Boone elaborated further about her conversation with the detective:

> Then he told me, come on, Alicia. He said, come on, you got something else to tell me. I said, no I don't have anything else to tell you. I said, I told you everything. He said, no, come on, you got something else. I said, Detective,—I was telling him, look, I don't. And then he—I mean he went on and on with that, and on. And then I said to him, look, [defendant]—and I said this. I said, look, [defendant] is—is mean. And then he said, he's mean. And I said yeah. And I said, I'm not going—I don't want to go in there and say—and he said, come on. He said, it's going to be all right, you know, I'm telling you it's going to be cool. I said, you know what. And then I didn't even agree actually. He said to the other detectives, you know what, I think Alicia has something else she want[s] to tell you guys. And that's when I went in there and made my second statement.

After her testimony on redirect, Boone's second recorded statement was played for the jury. The prosecutor then elicited testimony from Boone that she "was crying [during her second statement] because she was afraid of . . . [defendant]." Boone testified that, apart from telling her lawyer,[2] her cross-

---

[2]  Although she was not a party to the case or charged with any offenses, Boone retained a lawyer to advise her and represent her interests. That

examination on the previous day was the first time she had spoken about her interactions with, and alleged mistreatment by, Detective Carlos Rodriguez. Boone further testified that, by comparison, both Detective Valera and Sergeant Jose Rodriguez were "very good to [her]." The prosecutor also reaffirmed with Boone her third statement to Detective Valera and Sergeant Jose Rodriguez on August 21, 2013, in which she again told the police "that [defendant] said that he poked Chris."

On re-cross, defendant's counsel resumed his attack on the credibility of Boone's second and third statements to the police. Perhaps most significantly, defendant's counsel elicited dramatic testimony from Boone on a second re-cross in which she proclaimed, "my family and I are very much aware of who killed my cousin. We are much aware that it was not Dana Kearney."

Boone's Testimony About Her Payment of Defendant's Legal Fees and Interactions with His Counsel

Apart from their focus on Boone's police interviews, counsel also developed on the record certain facts relating to Boone's payment of defendant's legal fees. During her redirect by the State, Boone testified she had previously met defendant's trial counsel "[a]t his office" about "[t]hree

_____

separate attorney was not defendant's counsel. In fact, as the PCR judge found, defendant's attorney advised Boone to obtain her own counsel.

times" where they discussed "[p]ayment." Boone testified that defendant's counsel "wouldn't talk about the facts of the case" and she did not think anyone had gone with her to those meetings. At the end of the redirect, the prosecutor elicited the following testimony from Boone:

Q. Ms. Boone, you love [defendant], right?

A. Yes. I love all of them actually, but yes I do love [defendant].

Q. Like you told us before, you hired Mr. Duffy to represent him, right?

A. Yes.

Q. And you're paying for his services?

A. Yes.

Q. And [defendant] is the father of your child, right?

A. Yes.

Q. And since this incident, you've spoken to him thousands of times. Is that fair to say?

A. Yes.

Q. You've seen him hundreds of occasions, right?

A. Yes.

Q. You don't want to see anything bad to happen to him, right?

A No.

13

Q. Certainly not because of anything that you say, right?

A. Exactly.

On re-cross, defendant's counsel asked Boone about her visits to his office, prompting the following exchange:

Q. Now, the Prosecutor brought out that you have been to my office and that you had paid my legal fee.

A. Yes.

Q. When was the last time you were at my office?

A. I don't know. I mean, I don't—maybe 2014. . . . Maybe 2014. Maybe possibly. A few years ago.

. . . .

Q. So, after you paid my legal fee, we really had no other direct communication?

A. No.

On a second re-cross, defendant's counsel asked Boone if she was "coloring [her] testimony because [she] d[id]n't want anything bad to happen to [defendant]," to which Boone responded "No."

<u>Other Witnesses</u>

Other trial witnesses, including Boone's daughters, goddaughter, and mother's boyfriend, provided incriminating evidence regarding defendant's

14

actions. We refer in this regard to our discussion of the strength of the State's case in our 2020 opinion on direct appeal. Timmons, slip op. at 6-8, 23.

The Defense Summation

During his summation, defendant's counsel addressed at length Boone's statements to police. Counsel delved into her credibility and potential motives for changing her initial statement about defendant's alleged words to her on the day of her cousin's death. He argued Detective Carlos Rodriguez had pressured Boone, and that her recollection of defendant telling her that he had "poked" Sharp had been "manufactured" and was not credible:

> [I now turn to] [t]he handling of Alicia Boone by the police. All right. She's brought to the police station at about 3 a.m. She's placed in somewhat solitary confinement. Nobody could really get to her except the police. Once again, we return to the issue of statement integrity. Not only was statement integrity violated by allowing witnesses for at least an hour at the crime scene itself to talk to her, [and] her mother, it also was violated at police headquarters.
>
> . . . .
>
> So let's examine Alicia's first statement to the police. You saw her. She was calm. She disclosed exactly what was stated to her concerning the issue of what [defendant] told her about the nature of the injury.
>
> [Defendant] said he wanted to return to the house. Why? Chris got cut, or words to that effect. Chris got cut, or words to that effect. Compare that

15

with her statement some seven hours later. "I poked Chris," or words to that effect.

Now, [the] first statement is extremely different from the second statement, in what regard? Well, the first statement suggests facts that Alicia relied upon in reaching that conclusion. What were those facts? Glass was on the floor. In fact, Alicia indicated that her first reaction was that Chris must have cut himself on the glass on the floor. That was her initial reaction. Seems relatively straightforward, there's glass on the floor, he cut himself on that glass. Okay.

Then we go to the second one. What did that demonstrate? Well, the prosecutor is going to argue to you that the second statement, the second statement really was about the fact that he's mean. That was the point of the second statement, that he's mean? Or was that justification for the second statement. He's mean.

What possible, what possible, I don't know, what possible statement could that be, he's mean? Gone was that Chris got cut, and it was replaced by I poked him, or words to that effect. . . .

. . . .

Okay. At the end of the day, you have two dramatically different statements. You have the statement "Chris got cut" or words to that effect or "I think I poked Chris" or words to that effect. You must decide which of those statements are more reliable. It's on you. You must decide whether or not Alicia Boone, having sat in Perth Amboy Police Department for hours, changed up her statement for any other reason than well, [defendant]'s mean.

Now if you believe that Chris got cut, or words to that effect, then your duty is obvious; you must vote to acquit. <u>If you believe that Chris got cut or words to</u>

16

that effect, presents a reasonable alternative explanation to the State's theory, your duty is obvious; you must acquit. If you believe that "I poked Chris" is a reasonable, well, then, what can I tell you. You've already convicted.

. . . .

Didn't you expect Sergeant [Jose] Rodriguez to have stopped Alicia when she changed her statement regarding cut versus poked and ask her why she changed the statement? Didn't you expect Sergeant [Jose] Rodriguez to question Alicia about why she thought she was the only member of her family not to go home for all those 15 hours? After all, she was there voluntarily. Listen, I can go on for quite awhile, but I think at the end, you will be forced to conclude that the State manufactured a great deal in this case.

[(Emphasis added).]

2.

<u>The PCR Proceedings and the Court's Ruling on the Conflicts Issue</u>

After hearing oral argument, the PCR court issued an order and accompanying written decision on February 1, 2023 denying all relief apart from vacating court-imposed restitution.

The PCR court specifically rejected defendant's contention that his trial attorney had a disqualifying conflict of interest. The PCR court found that "based on th[e] limited interaction between Boone and trial counsel, it cannot be said that there was an actual conflict of interest. The record reflects . . . Boone interacted with trial counsel solely for the purpose of paying his legal

fees. Without more, these limited interactions did not create an actual conflict." Thus, "[b]ased on the totality of the circumstances, there was no per se conflict or improprieties as to trial counsel's responsibilities towards the petitioner."

In reaching this conclusion, the PCR court observed that "[w]hile it may be atypical for a victim's cousin and the State's main witness to pay for the petitioner's legal fees, those facts alone do not create an actual conflict of interest." The PCR court relied on the following series of pivotal facts reflecting the absence of a true conflict:

> The interactions between trial counsel and Boone were limited in nature; arising early in the litigation when Boone made payments to trial counsel for his services. Boone is not alleged to have discussed the substance or case strategies with trial counsel. Nor did her communications with trial counsel extend beyond discussing payment. This case went on for several years, without any indication of further communication between Boone and trial counsel. Additionally, trial counsel's decision to refer Boone to another attorney, showcases his attempts to prevent any appearance of impropriety, and to a greater extent, any actual conflict of interest and protect the petitioner.

Rejecting the alleged necessity of an evidentiary hearing, the PCR court found that "[t]he record below is clear relative to the issues raised in this PCR [and that] [w]ithout showing how the results would have been different, an

evidentiary hearing is not warranted."[3]  The PCR court further concluded that "[f]or the reasons addressed above as to each of his claims, the [defendant] has not made out a prima facie case to warrant an evidentiary hearing."

3.

In analyzing defendant's allegations that his trial attorney was compromised by Boone's payment of his legal fees, we are guided by both case law and principles of legal ethics.

General Conflict of Interest Principles Affecting Criminal Defendants

Generally, for counsel to be "effective" under our State Constitution, counsel must provide the client "undivided loyalty, '"unimpaired" by conflicting interests.'"  State v. Cottle, 194 N.J. 449, 466-67 (2008) (quoting State v. Norman, 151 N.J. 5, 23 (1997)).  "There is no greater impairment of a defendant's constitutional right to counsel than that which can occur when his attorney is serving conflicting interests.  The resulting representation may be more harmful than the complete absence of a lawyer."  State v. Bellucci, 81 N.J. 531, 538 (1980); accord State v. Sheika, 337 N.J. Super. 228, 244 (App. Div. 2001).

---

[3]  The PCR court also made findings rejecting defendant's claim that his counsel failed to provide him with adequate advice concerning his right to testify, which we discuss, infra, in Part II(B).

19

Even so, "a great likelihood of prejudice must be shown . . . to establish constitutionally defective representation of counsel." Cottle, 194 N.J. at 467-68. The conflict must be based in fact, rather than merely create the appearance of impropriety. State v. Hudson, 443 N.J. Super. 276, 289 (App. Div. 2015) ("Disqualification must be based on an actual conflict or potential conflict of interest, as now defined by the RPCs.") (emphasis added).

This court's "evaluation of an actual or apparent conflict . . . does not take place in a vacuum, but is, instead, highly fact specific." State v. Harvey, 176 N.J. 522, 529, (2003) (citations and internal quotation marks omitted). "In that respect, the [c]ourt's attention is directed to something more than a fanciful possibility." Ibid. "To warrant disqualification in this setting, the asserted conflict must have some reasonable basis." Ibid.

Similarly in this regard, under federal law, the mere "possibility" of a conflict of interest "is insufficient to impugn a criminal conviction." Cuyler v. Sullivan, 446 U.S. 335, 350 (1980). To avoid the prejudice inquiry under prong two of Strickland, a defendant bringing an ineffective assistance of counsel claim under the Sixth Amendment must prove an "actual" rather than a mere "potential" conflict of interest and also that "the conflict adversely affected counsel's performance." Mickens v. Taylor, 535 U.S. 162, 170 (2002).

20

To be sure, New Jersey courts have departed from their federal counterparts and "have exhibited a much lower tolerance for conflict-ridden representation under the New Jersey Constitution than federal courts have under the United States Constitution," and have accordingly found that "certain attorney conflicts render the representation per se ineffective," warranting a presumption of prejudice.  Cottle, 194 N.J. at 470; see also State v. Drisco, 355 N.J. Super. 283, 292 (App. Div. 2002) ("New Jersey's constitutional standard thus provides broader protection against conflicts than does the Federal Constitution.").

Is There a Per Se Conflict?

Under New Jersey's "two-tiered approach in analyzing whether a conflict of interest has deprived a defendant of his state constitutional right to the effective assistance of counsel," courts must first determine whether the alleged conflict is a "per se conflict."  Cottle, 194 N.J. at 467.  If a per se conflict is found, "prejudice is presumed in the absence of a valid waiver, and the reversal of a conviction is mandated."  Ibid.  In addition to that presumption, there is also a strong presumption against waiver of a defendant's "constitutional right to independent counsel." Bellucci, 81 N.J. at 544.

The "per se analysis is reserved for those cases in which counsel's performance is so likely to prejudice the accused that it is tantamount to a

complete denial of counsel." Savage, 120 N.J. at 616; see also State v. Miller, 216 N.J. 40, 70 (2013) ("[O]nly an extraordinary deprivation of the assistance of counsel triggers a presumption of prejudice."). For a conflict of interest to trigger a per se deprivation of the right to counsel there must be an "overriding concern of divided loyalties." Cottle, 194 N.J. at 467 n.8. For these reasons, our Supreme Court "has never presumed prejudice . . . in a situation . . . in which the defendant was represented by competent counsel with no conflict of interest." Miller, 216 N.J. at 60-61.

Courts have generally "limited the per se conflict on constitutional grounds to cases in which 'a private attorney, or any lawyer associated with that attorney, is involved in simultaneous dual representations of codefendants.'" Cottle, 194 N.J. at 467 (quoting Norman, 151 N.J. at 24-25). See, e.g., State ex rel. S.G., 175 N.J. 132, 134-35 (2003) (holding that a law firm's simultaneous representation of a shooting suspect and the estate of the shooting victim constituted an unwaivable conflict of interest); State v. Murray, 162 N.J. 240, 250 (2000) (holding that the defendant made a prima facie showing of a per se conflict warranting an evidentiary hearing, where the attorneys for defendant and a codefendant shared "office space and a phone number"); Bellucci, 81 N.J. at 544 ("Whenever the same counsel including partners or office associates represents more than one [co]defendant, both the

attorney and the trial court must explain the possible consequences of joint representation to each defendant."). Here, that particular situation did not exist because defendant's two codefendants had their own attorneys.

Given these principles, we must consider whether the payment of defendant's legal fees by a person who is called as a witness for the prosecution should be regarded inherently as creating a per se conflict. That leads us to consider principles of legal ethics that address the payment of a client's legal fees by a third party.

Payment by Third Parties

Under New Jersey's Rules of Professional Conduct (the "RPCs"), "lawyer[s] shall not accept compensation for representing a client from one other than the client unless: (1) the client gives informed consent; (2) there is no interference with the lawyer's independence of professional judgment or with the lawyer-client relationship; and (3) information relating to representation of a client is protected." RPC 1.8(f).

Our Supreme Court has noted that "RPC 1.8(f) does not exist in a vacuum: two other RPCs directly touch on the question presented." In re State Grand Jury Investigation, 200 N.J. 481, 494 (2009). "First, RPC 1.7(a) . . . recognizes '[a] concurrent conflict of interest . . . if: . . . there is a significant risk that the representation of one or more clients will be materially

limited by the lawyer's responsibilities to . . . a third person or by a personal interest of the lawyer."  Ibid. (quoting RPC 1.7(a)(2)).  "Second, RPC 5.4(c) provides that '[a] lawyer shall not permit a person who recommends, employs, or pays the lawyer to render legal services for another to direct or regulate the lawyer's professional judgment in rendering such legal services.'"  Ibid.

In In re State Grand Jury Investigation, the Court found that "[a] synthesis of RPCs 1.7(a)(2), 1.8(f) and 5.4(c) yield[ed] a salutary, yet practical principle:  a lawyer may represent a client but accept payment, directly or indirectly, from a third party provided each of the six conditions is satisfied." 200 N.J. at 495.  Those six conditions are:

> (1) The informed consent of the client is secured.  In this regard, "'[i]nformed consent' is defined as the agreement by a person to a proposed course of conduct after the lawyer has communicated adequate information and explanation about the material risks of and reasonably available alternatives to the proposed course of conduct."
>
> (2) The third-party payer is prohibited from, in any way, directing, regulating or interfering with the lawyer's professional judgment in representing his client. . . .
>
> (3) There cannot be any current attorney-client relationship between the lawyer and the third-party payer.
>
> (4) The lawyer is prohibited from communicating with the third-party payer concerning the substance of the representation of his client. . . .

(5) The third-party payer shall process and pay all such invoices within the regular course of its business, consistent with manner, speed and frequency it pays its own counsel.

(6) Once a third-party payer commits to pay for the representation of another, the third-party payer shall not be relieved of its continuing obligations to pay without leave of court brought on prior written notice to the lawyer and the client. . . .

[Id. at 498-97 (internal citations omitted).]

The last five of these six conditions were clearly not violated here. As the PCR court found, Boone did not direct or interfere with defendant's counsel's representation of his client. Nor is there evidence she communicated with his counsel concerning the substance of the case. As described by Boone in her testimony, she had three meetings with counsel at the outset of his work to discuss and arrange payment, and that was essentially the end of their contact. No billing disputes or payment problems were identified. And defendant's counsel had no attorney-client relationship with Boone. To the contrary, as the PCR court found, defendant's counsel recommended Boone secure her own attorney to represent her interests—which she did.

As to the first condition concerning defendant's informed consent, we acknowledge the record contains no documentation of such express consent. Defendant alleges in his petition that counsel "never advised him or sought a

25

waiver" of a potential conflict.[4]  Because defendant's counsel is now deceased, the veracity of that claim cannot realistically be disproved.

But we decline to hinge a finding of a per se conflict and constitutional violation upon such a "bald assertion."  See Cummings, 321 N.J. Super. at 170. We reach that conclusion for several reasons.  First and foremost, the non-compliance with an ethics requirement, while relevant, does not automatically trigger per se civil or criminal consequences.  Baxt v. Lilola, 155 N.J. 190, 197-98 (1998).  Second, it is readily inferable from the record that defendant must have been fully aware that his co-parent Boone had paid his legal fees, as was adduced in open court by Boone's trial testimony.  Third, counsel's behavior, as we will discuss in more detail, demonstrated that he acted as a zealous advocate of defendant's interests and exhibited loyalty to his client. See RPC 1.7; Cottle, 194 N.J. at 463.  Counsel advocated fiercely to negate Boone's second and third police statements about defendant "poking" the victim.  He elicited extremely favorable testimony from her attesting that she did not believe defendant killed Sharp.  Any conceivable division of counsel's

---

[4]  Notably, defendant does not claim he was unaware that Boone was paying his defense counsel's fees.  And when the State brought out in Boone's trial testimony that she had paid the fees, and defendant's counsel adduced further information about the fee arrangement in cross-examination, the transcript lacks any indication that defendant was surprised by this disclosure to the jury or that he sought a mistrial.

loyalties that could be the subject of a waiver was, in retrospect, purely hypothetical.

We take judicial notice it is not unusual that a defendant's family and friends will pay a private defense lawyer's fees to represent a loved one or close acquaintance who is accused of a crime. Such private defense counsel perform a vital institutional role in supplementing the services provided by the Office of the Public Defender to clients who personally cannot afford counsel. In a few instances, as here, that payer may also be a potential fact witness for the State at the ensuing criminal trial. We discern no per se constitutional prohibition on such fee arrangements if they are disclosed and with the assent of the defendant and where the counsel's vigorous representation of the client is not being materially limited by the payer.

That said, going forward, we recommend that private criminal defense counsel document the client's informed consent with a written acknowledgment or some other recorded means at the time the fee arrangement is made. See RPC 1.8(f)(1). There may, of course, be instances in which the payer's testimony for the State is anticipated to be so hostile to a defendant's interests that the lawyer is, in fact, materially limited. This is not one of them.

We also reject any notion that defendant's counsel here was materially limited by the fact that Boone paid his legal fees. The record contains not a

27                                                          A-2638-22

shred of evidence that defendant's counsel was restrained by Boone in his advocacy of his client. There are no indicia that counsel was timid in his repeated cross-examinations of Boone. To the contrary, he vigorously endeavored to show the critical portions of her second and third police statements were not truthful.

Actual Conflict Analysis

Having concluded that there was no per se conflict here, case law instructs us that "the potential or actual conflict of interest must be evaluated and, if significant, a great likelihood of prejudice must be shown in that particular case to establish constitutionally defective representation of counsel." Norman, 151 N.J. at 25 (emphasis added); accord Cottle, 94 N.J. at 467-68 (quoting same). In this non-per se context, prejudice is not presumed. Norman, 151 N.J. at 25.

A "great likelihood of prejudice" is itself a lower standard than prong two of the Strickland test, which requires showing that counsel's errors actually "prejudiced defendant." Fritz, 105 N.J. at 66. "If [such] a great likelihood of prejudice is found, then we presume that actual prejudice has resulted in constitutionally defective representation." Drisco, 355 N.J. Super. at 292-93.

For reasons we have already canvassed, there was no actual conflict of interest here, and certainly no "great likelihood of prejudice." See Fritz, 105 N.J. at 66. We repeat that defendant's counsel advocated his interests forcefully. Counsel stridently endeavored to undermine the incriminating portions of Boone's police statements. His lengthy parries in Boone's cross-examination prompted the State to respond with extensive questioning on redirect. He spotlighted the problems in the State's case in a forceful summation.

We realize counsel's strategic efforts failed in the end, given the strengths of the State's other proofs, which we noted on direct appeal. But, as case law instructs, trial counsel's strategic choices, even if they fail, are generally inadequate to establish constitutional ineffectiveness. Marshall, 123 N.J. at 165; Sheika, 337 N.J. Super. at 243.

To sum it up, we affirm the PCR court's sound rejection of defendant's conflict of interest argument. No evidentiary hearing on the issue was required in these circumstances. State v. Preciose, 129 N.J. 451, 462-63 (1992).

B.

Defendant's other claim of his counsel's ineffectiveness, i.e., that he was allegedly deprived of adequate advice about his right to testify at trial, warrants little discussion.

29

The PCR court found defendant's contention regarding his counsel's failure to advise him about his right to testify unavailing because "the trial record amply demonstrates that defendant knew he had the right to testify and voluntarily waived that right." The PCR court found "[a]dditionally, the record reflects that the [defendant] told the judge that he had adequate time to discuss the potential of testifying with his lawyer [and that] [f]ollowing the judge's questioning, the [defendant] waived his right to testify."

The PCR court concluded that "[n]otwithstanding any alleged failure by trial counsel to discuss [defendant's] right to testify—which is belied by the [defendant's] sworn testimony that he did discuss [testifying]—the trial judge's voir dire was sufficient to notify the defendant of his rights, which he ultimately waived."

The PCR court further addressed the possibility of trial strategy, noting that "[t]he [trial] court's colloquy with [defendant] included advising the [defendant] that he could be cross-examined about his prior record of conviction." The PCR court found that "[i]t would fall within the realm of trial strategy decisions to avoid testifying in light of [defendant's] record." Citing the "well-established" law that counsel's "strategic choices made after thorough investigation of law and facts relevant to plausible options are

30

virtually unchallengeable," the PCR court found that "without more, a trial strategy's failure does not render performance deficient."

We fully adopt these findings. Defendant's second argument is utterly without merit, and no evidentiary hearing about it was necessary.

## III.

In conclusion, we affirm the trial court's dismissal of defendant's PCR petition for the abundant reasons we have stated. Defendant's now-deceased trial counsel had no per se or actual conflict of interest arising from the fee arrangement with Boone. Moreover, defendant was manifestly advised sufficiently about his right to testify.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2638-22